**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**(SAN ANTONIO DIVISION)**

| | | |
|---|---|---|
| PATRICK ZELLNER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CST BRANDS, INC., KIM LUBEL, ALAN SCHOENBAUM, DONNA M. BOLES, ROGER G. BURTON, ROCKY B. DEWBRE, THOMAS W. DICKSON, RUBEN M. ESCOBEDO, DENISE INCANDELA, JOSEPH E. REECE, STEPHEN SMITH, JOSEPH V. TOPPER, JR., and MICHAEL WARGOTZ,<br><br>Defendants. | § § § § § § § § § § § § § § § § § | Case No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATION OF SECTIONS 14(A) AND 20(A) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against Defendants (defined below), alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a class action brought on behalf of the public shareholders of CST Brands, Inc. ("CST" or the "Company") against CST and its Board of Directors (the "Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and to enjoin the vote on a proposed transaction, pursuant to which CST will be acquired by Alimentation Couche-Tard Inc. ("Couche-Tard"), through its U.S.-based subsidiary Circle K Stores Inc.

("Parent" or "Circle K") and Parent's wholly-owned subsidiary Ultra Acquisition Corp. ("Merger Sub") (the "Proposed Transaction").

2. On August 22, 2016, the Company issued a press release announcing that it had entered into an Agreement and Plan of Merger (the "Merger Agreement") to sell CST to Couche-Tard. Under the terms of the Merger Agreement, Couche-Tard will acquire all outstanding shares of CST for $48.53 in cash per CST common share (the "Merger Consideration"). Couche-Tard will also, through its acquisition of CST, acquire CST's interest in CrossAmerica Partners LP ("CrossAmerica" or "CAPL"), a leading wholesale fuels distributor and owner and lessor of real estate used in the retail distribution of motor fuels, and associated Incentive Distribution Rights ("IDRs").

3. The Proposed Transaction is the result of an unfair process and provides the Company's shareholders with inadequate consideration. As described below, both the value to CST shareholders contemplated in the Proposed Transaction and the process by which Defendants propose to consummate the Proposed Transaction are fundamentally unfair to Plaintiff and the other public shareholders of the Company.

4. Furthermore, the Board agreed to lock up the deal with a number of coercive deal protection devices in the Merger Agreement, including: (a) a "no-solicitation" clause that prevents the Company from soliciting and providing nonpublic information to potential alternate bidders; (b) an "information rights" provision that requires the Company to promptly advise Couche-Tard of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal; (c) "matching rights" that allow Couche-Tard four (4) business days to match any superior offer, plus an additional two (2) business day period following a material amendment to the terms and

conditions of a superior offer or the submission of a new offer; and (d) a provision requiring CST to pay a termination fee of $133 million if the Company decides to pursue a competing offer. The collective effect of these provisions is to chill any potential post-deal market check.

5. Additionally, CST insiders stand to gain handsomely from the Proposed Transaction. In addition to gaining liquidity for their otherwise illiquid shares and options, the Company's named executive officers stand to receive substantial severance benefits in connection with the Proposed Transaction. For example, CST President, Chief Executive Officer ("CEO") and director Kim Lubel ("Lubel") stands to receive over $6.6 million for her unvested stock options, restricted share units and market share units, as well as over $6.4 million in cash and severance benefits. While CST's public shareholders will lose control of the Company for an unfair price, certain Company insiders will substantially benefit if the Proposed Transaction is consummated.

6. Finally, compounding the unfairness of the Proposed Transaction, on September 16, 2016, CST filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC"). The Proxy, which recommends that CST shareholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (a) CST management's projections, utilized by the Company's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated, ("BofA Merrill Lynch") in its financial analyses; (b) the valuation analyses performed by Merrill Lynch in connection with the rendering of its fairness opinion; and (c) material information concerning the sale process leading up to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of the above-referenced sections of the Exchange Act

as shareholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

7. The Proposed Transaction is designed to unlawfully divest CST's public shareholders of the Company's valuable assets without fully disclosing all material information concerning the Proposed Transaction to Company shareholders. Plaintiff seeks to enjoin the shareholder vote on the Proposed Transaction unless and until such problems are remedied and the material information presently being withheld from CST shareholders is disseminated to CST shareholders prior to the shareholder vote on the Proposed Transaction.

## JURISDICTION AND VENUE

8. This This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act.

9. This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10. Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of CST common stock.

12. Defendant CST is a Delaware corporation with its principal executive offices located at One Valero Way, Building D, Suite 200, San Antonio, Texas, 78249.

13. ***Defendant Kim Lubel*** ("Lubel") has been President and CEO of the Company since January 2013 and served as Chairman of the Board since April 2013 and a director of the Company since November 2012.

14. ***Defendant Alan Schoenbaum*** ("Schoenbaum") has been a director of the Company since April 2013. Schoenbaum is Chair of the Executive Committee.

15. ***Defendant Donna M. Boles*** ("Boles") has been a director of the Company since April 2013. Boles is Chair of the Compensation Committee.

16. ***Defendant Roger G. Burton*** ("Burton") has been a director of the Company since April 2013. Burton is Chair of the Audit Committee.

17. ***Defendant Rocky B. Dewbre*** ("Dewbre") has been a director of the Company since March 2016. Dewbre is a member of the Compensation Committee.

18. ***Defendant Thomas W. Dickson*** ("Dickson") has been a director of the Company since March 2016 and is a member of the Nominating and Governance Committee.

19. ***Defendant Ruben M. Escobedo*** ("Escobedo") has been a director of the Company since April 2013. Escobedo is a member of the Audit Committee.

20. ***Defendant Denise Incandela*** ("Incandela") has been a director of the Company since June 2013. Incandela is a member of the Compensation Committee.

21. ***Defendant Joseph E. Reece*** ("Reece") has been a director of the Company since November 2015. Reece is a member of the Executive Committee and the Nominating and Governance Committee.

22. ***Defendant Stephen Smith*** ("Smith") has been a director of the Company since March 2014. Smith is a member of the Audit Committee.

23. ***Defendant Joseph V. Topper, Jr.*** ("Topper") has been a director of the Company since October 2014.

24. ***Defendant Michael Wargotz*** ("Wargotz") has been a director of the Company since April 2013. Wargotz is Chair of the Nominating and Governance Committee and a member of the Executive Committee.

25. Defendants Lubel, Schoenbaum, Boles, Burton, Dewbre, Dickson, Escobedo, Incandela, Reece, Smith, Topper, and Wargotz are collectively referred to herein as the "Board" or the "Individual Defendants."

## OTHER RELEVANT ENTITIES

26. Couche-Tard is a Canadian corporation and multinational operator of convenience stores in North America and Europe.

27. Parent is a Texas corporation and an indirect wholly owned subsidiary of Couche-Tard.

28. Merger Sub is a Delaware corporation and an indirect wholly owned subsidiary of Parent.

29. CrossAmerica is a leading wholesale distributor of motor fuels and owner and lessor of real estate used in the retail distribution of motor fuels. Its general partner, CrossAmerica GP LLC, is a wholly owned subsidiary of CST.

## CLASS ACTION ALLEGATIONS

30. Plaintiff brings this action as a class action on behalf of herself and the other public stockholders of CST (the "Class"). Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

31. This action is properly maintainable as a class action.

32. The Class is so numerous that joinder of all members is impracticable. As of August 18, 2016, there were approximately 75,684,881 shares of Company common stock issued and outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

33. Questions of law and fact are common to the Class, including, among others: (i) whether defendants violated the 1934 Act; and (ii) whether Defendants will irreparably harm plaintiff and the other members of the Class if Defendants' conduct complained of herein continues.

34. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class. Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

35. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

36. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

**Background**

37. CST is one of the largest independent retail and wholesale distributors of motor fuel, convenience merchandise and services in North America. After purchasing 100% of the equity interests of its general partner, CST controls CrossAmerica, which is primarily engaged in the wholesale distribution of motor fuel and the ownership and leasing of real estate used in the retail distribution of motor fuel.

38. CST and CrossAmerica together have approximately 3,000 retail sites throughout 32 states in the U.S. and six provinces in eastern Canada. Corner Store is the Company's primary convenience store brand in the U.S. retail segment and in English speaking provinces in Canada, selling many signature products, proprietary freshly baked and packaged goods, and filling grocery items. The Company's convenience store brand in French speaking provinces in Canada is Dépanneur du Coin, selling signature coffee, pastries and other prepared foods and drinks.

39. The Company's recent financial results underscore its promising prospects, showing significant improvements year over year. For example, on February 19, 2016, the Company issued a press release announcing its financial results for the fourth quarter and year-end of 2015. In the fourth quarter, the Company's U.S. merchandise and services gross profit increased 6% compared to the same quarter 2014, primarily due to the Company's acquisitions of Nice N Easy and Landmark stores and an increase in the number of New-to-Industry stores. Same store merchandise and services sales increased in both the U.S. and Canada.

40. For the year ended December 31, 2015, the Company reported adjusted net income of $263 million and diluted earnings per common share of $3.44. For the year ended December

31, 2014, adjusted net income was $200 million and diluted earnings per common share was $2.63. This represents an improvement of more than 30% compared to the same period in 2014.

41. On May 6, 2016, the Company reported its financial results for the first quarter of 2016. Net income for the first quarter was $19 million, compared to $14 million for the comparable period of 2015. U.S. merchandise and services gross profit increased 25% year over year, primarily driven by an overall increase in merchandise sales and gross margins in the Company's U.S. core and New-to-Industry store sales. Motor fuel gross profit (per gallon) increased to $75 million in the first quarter of 2016 compared to $63 million year over year.

42. Furthermore, EBITDA was $79 million, compared to $66 million for the first quarter of 2015, a 20% increase. Lubel stated in relevant part:

> We had a strong first quarter led by impressive improvements in retail merchandise sales and gross profits. U.S. merchandise and services gross profits grew by 25% over the first quarter of 2015 on increased sales and margins. Our Canadian stores grew merchandise and services gross profits by 10%, excluding the impact of foreign currency exchange, with an impressive 6% increase in same store sales. We showed continued strength in fuel gross profits in the U.S., as a result of a favorable fuel margin environment and our continued fuel pricing optimization initiatives. We also executed on our organic and acquisition growth plans with the addition of 173 stores to our network, including the 165-store Flash Foods network.

43. The Company released its second quarter 2016 financial results on August 5, 2016. Net income was $27 million, or $0.36 per diluted share, which is an increase of 8% and 13%, respectively, from $25 million, or $0.32 per diluted share in the second quarter of 2015. The Company generated EBITDA of $98 million, representing a 23% increase compared to $80 million for the same period in 2015. U.S. merchandise and services gross profit grew 27% and motor fuel gross profit in the U.S. increased to $73 million, compared to $59 million year over

year. In Canada, motor fuel gross profit grew 3% and merchandise and services gross profit increased 5% year over year. Lubel stated in relevant part:

> During the second quarter of 2016, we grew the company with impressive results both inside the stores and at the fuel pumps. This was led by continuing and substantial improvements in the U.S. with overall gross profits climbing to $233 million on increased sales and a 110 basis point improvement in merchandise and services margin capture over the second quarter of 2015. Our Canadian stores grew merchandise and services gross profits 10%, excluding the effects of foreign currency change. We closed on the sale of our California and Wyoming properties, allowing us to bring down our debt and position the company for continued growth. The integration of our Flash Foods network is on target and we have opened two new stores in Georgia and Florida. We have opened a total of 18 new stores in 2016 with 39 additional stores under construction. I am pleased with our continued growth, reach, and ability to delight more customers every day.

**<u>Flawed Sales Process</u>**

44. Despite CST's recent financial success and positioning for growth, the Board conducted a flawed sale process tilted in favor of a transaction with Couche-Tard's wholly owned subsidiary Circle K.

45. In mid-October 2015, Brian Hannasch ("Hannasch"), President and CEO of Couche-Tard, contacted Lubel to schedule a meeting in San Antonio, Texas, during which he mentioned potential interest in a combination of CST and Couche-Tard.

46. On October 30, 2015, CST received a letter from Couche-Tard describing a non-binding proposal to acquire 100% of CST common stock for a price between $43.50 and $45.35 per share in cash. After the Board met with, among others, BofA Merrill Lynch, it decided that it would not be in CST shareholder's best interests to pursue the proposed transaction.

47. On December 12, 2015, CST received another letter from Couche-Tard describing a non-binding proposal to acquire the Company for $46.80 per share in cash. After the Board met

with, among others, BofA Merrill Lynch, it decided not to pursue the proposed transaction. Lubel met with Hannasch in Indianapolis, Indiana, to communicate this, and alternatively indicated that CST was willing to discuss a potential sale of particular CST assets to Couche-Tard, including certain stores in the western United States and businesses in Canada.

48. In early January 2016, Hannasch contacted Lubel and stated Couche- Tard was not interested in pursuing a potential purchase of particular CST assets and instead increased its non-binding proposal for all of CST's outstanding common stock to $48.50 per share in cash. After the Board met with, among others, BofA Merrill Lynch, it determined not to pursue Couche-Tard's revised nonbinding proposal and Lubel responded to Hannasch accordingly.

49. In January and February of 2016, Lubel met with the CEO of a company with a convenience store business (referred to in the Proxy as "Company A") and discussed the possibility of separating Company A's convenience store business from its other businesses to then combine with CST's business.

50. Also in mid-January, Lubel spoke with executives of another industry participant (referred to in the Proxy as "Company B") regarding the possibility of a transaction between Company B and CST, but no price or terms were discussed.

51. In late January 2016, the Company entered into a confidentiality agreement with Couche-Tard, which contained a standstill provision.

52. On February 8, 2016, Hannasch and outside legal counsel met with Lubel, Schoenbaum and Senior Vice President, General Counsel and Corporate Secretary of CST, Gérard Sonnier ("Sonnier"). During the meeting, Hannasch orally revised Couche-Tard's non-binding proposal to $49.00 per share in cash and indicated that if the offer was not accepted,

Couche-Tard would make public a proposal to acquire CST at a lower price after the standstill period expired in the confidentiality agreement.

53. On February 12, 2016, Lubel spoke with representatives of a private equity firm (referred to in the Proxy as "Sponsor 1") regarding the possibility of an investment or acquisition of the Company by Sponsor 1, but no price or terms were discussed.

54. On February 18, 2016, the Board met to consider Couche-Tard's revised proposal, and Lubel updated the Board regarding discussions with Company A. The Board decided not to pursue Couche-Tard's revised proposal and directed BofA Merrill Lynch to approach another industry participant on a confidential basis to determine its level of interest in a potential transaction with CST.

55. In late February 2016, Lubel met with the CEO of another industry participant (referred to in the Proxy as "Company C") regarding the possibility of a transaction between Company C and CST, but no price or terms were discussed.

56. Also in late February 2016, each of CST shareholders JCP Investment Management and Engine Capital, L.P. publicly announced its intent to nominate a slate of directors at the Company's upcoming 2016 annual meeting of stockholders. JCP Investment Management did not identify particular nominees in its announcement, but Engine Capital, L.P. identified four candidates it proposed to nominate. Discussions occurred between CST and each of these investors.

57. On March 1, 2, and 3, 2016, the Board met with, among others, management and BofA Merrill Lynch to discuss a potential settlement with the investors and the preliminary expressions of interest from Company A, Sponsor 1, Company B and Company C. The Board decided to establish an ad hoc committee (referred to in the Proxy as the "Strategic Review

Committee"), composed of Reece, Schoenbaum, and Wargotz. Additionally, after further discussions with Couche-Tard, CST issued a press release announcing that it was commencing a formal sale process.

58. Also on March 3, 2016, the Board approved settlement agreements with JCP Investment Management and Engine Capital, L.P. Dickson and Dewbre were appointed to the Board, and Dickson was also added to the Strategic Review Committee. Several days later, the Strategic Review Committee elected Reece as Chairman of the Strategic Review Committee and discussed the strategic review process.

59. On March 14, 2016, the Strategic Review Committee received a letter and accompanying draft merger agreement from Couche-Tard reiterating its previous non-binding proposal, demanding a response by close of business on March 18, 2016. The Strategic Review Committee decided not to pursue the proposal but invited Couche-Tard to participate in the formal sale process.

60. During March and April, the Strategic Review Committee, CST management, and its financial and legal advisors conducted the formal process whereby BofA Merrill Lynch responded to inquiries by 92 parties. Of those 92 parties, 27 entered into confidentiality agreements with CST, though it is unclear whether those confidentiality agreements contained standstills. The parties were instructed to submit non-binding proposals for a transaction on or before May 12, 2016. Throughout the process, the Board received periodic updates from the Strategic Review Committee and from CST's senior management.

61. The Strategic Review Committee retained J.P. Morgan Securities LLC ("JP Morgan") to review possible alternatives other than a sale of CST in its entirety.

62. In mid-May 2016, CST received nine first-round bids. Six parties submitted preliminary proposals to acquire the entire company for cash, valuing the common stock at a range from $40.00 to $55.00 per share. Company A proposed a separation from its remaining business of its convenience store business, which would then merge with CST, valuing CST common stock at $45.31. Company B submitted a non-specific letter without a valuation range. Company C proposed acquiring only CST's U.S. retail assets, indicating an enterprise value between $3.0 billion and $3.3 billion.

63. On May 18, 2016, CST received a revised non-binding proposal from Company B with an indicative price of $50.50 per share.

64. In late May and early June, CST granted Company A, Company B, and three other potential acquirers (referred to in the Proxy as "Sponsor 2," "Sponsors 1/3," and "Company D/Sponsor4") access to a virtual data room to facilitate due diligence. Company C indicated it was no longer interested in participating in the process. An additional potential acquirer (referred to in the Proxy as "Company E"), which had not executed a confidentiality agreement or received nonpublic information, communicated a non-binding proposal to acquire CST's Canadian assets for $1.5 billion Canadian dollars (approximately $1.1 billion U.S. dollars).

65. In mid-June, the Strategic Review Committee requested that interested parties submit second round bids by June 30, 2016.

66. CST received second round proposals from Couche-Tard, Sponsor 2, Company D/Sponsor 4 and Company A. Couche-Tard's proposal of $45.00 to $49.00 per share and Sponsor 2's proposal of $47.00 to $50.00 per share remained unchanged, but Sponsor 2 indicated a desire to partner with a strategic acquirer to finance and complete the transaction. Company D/Sponsor 4 revised its initial proposal to $47.00 to $50.00 per share, and indicated it wished to

include an additional acquirer (referred to in the Proxy as "Sponsor 6") in its bidding group. Company A revised its bid to $47.19 per share.

67. On July 4, 2016, the Strategic Review Committee determined that all four bidders should remain in the process, and on July 15, 2016, it requested final bids by August 8, 2016.

68. On August 5, 2016, BofA Merrill Lynch informed the Strategic Review Committee that Company A had notified BofA Merrill Lynch that it was no longer interested in pursuing a separation of its retail assets, but continued to express a general interest in a transaction with CST, possibly contributing its retail business into a joint venture with CST.

69. On August 8, 2016, CST received an offer from Couche-Tard to acquire CST for $48.00 per share and a draft of the merger agreement, which contemplated that Couche-Tard's U.S. subsidiary, Circle K, would be the counterparty to CST. Couche-Tard's offer also required suspension of CST's quarterly dividend following announcement. CST received a proposal from Sponsor 2 offering $48.00 to $49.00 per share and requiring 30 to 45 days of exclusivity to complete its diligence. Company D/Sponsor 4 also submitted a letter, indicating a range of $47.00 to $49.00 per share, requiring at least 30 days of exclusivity to complete due diligence and an additional equity partner. Company A submitted a letter stating that it remained interested in a possible transaction with CST, but did not specify any price or terms.

70. On August 12, 2016, the Board met to review the final bids. BofA Merrill Lynch and Reece summarized economic provisions of the proposals for the Board and, following discussion and despite a higher offer proposed by Sponsor 2, the Board authorized CST and its advisors to negotiate with Couche-Tard regarding its offer.

71. During negotiations, Couche-Tard agreed to increase its offer price to $48.53 per share but insisted that CST suspend quarterly dividends on its common stock during the pendency of the transaction.

72. On August 15, 2016, the media reported that a deal between Couche-Tard and CST was near.

73. On August 21, 2016, Couche-Tard's board of directors unanimously approved the Merger Agreement and the unconditional guarantee, and the boards of directors of Circle K and Merger Sub also unanimously approved the Merger Agreement. Thereafter, Couche-Tard informed CST management of those approvals.

74. Also on August 21, 2016, the Board held a meeting with CST management and its advisors, during which BofA Merrill Lynch provided its fairness opinion. The Board subsequently approved the Merger Agreement.

75. Later that day, CST entered into the Merger Agreement. The next morning, CST and Couche-Tard issued a joint press release announcing the Proposed Transaction.

**The Inadequate Proposed Transaction**

76. On August 21, 2016, following the Board's approval, CST entered into the Merger Agreement with Couche-Tard and its subsidiaries for inadequate consideration. The next day, CST issued a press release stating, in relevant part:

> SAN ANTONIO -- (BUSINESS WIRE) -- Aug. 22, 2016 -- CST Brands, Inc. (NYSE: CST), one of the largest independent retailers of motor fuels and convenience merchandise in North America, today announced that its Board of Directors has unanimously approved a definitive merger agreement with Alimentation Couche-Tard Inc. (TSX: ATD.A ATD.B) ("Couche-Tard"), under which Couche-Tard will acquire all of the shares of CST for $48.53 per share in cash, representing a total enterprise value of approximately $4.4 billion, including the assumption of net debt.

> The transaction value represents a premium of approximately 42 percent to CST's closing stock price on March 3, 2016, the last date prior to CST announcing that its Board commenced an exploration of strategic alternatives to further enhance stockholder value. The transaction also represents a premium of approximately 61 percent since May 1, 2013, the last date prior to regular way trading of CST following the Company's spin off. Couche-Tard is a global leader in the convenience and fuel retail industry, with a strong Circle K brand across the U.S. Together, Couche-Tard and CST will join on the journey to become the world's preferred destination for convenience and fuel.

77. The Merger Consideration fails to recognize the value of CST to Couche-Tard. In a press release issued by Couche-Tard on August 22, 2016, Hannasch described the benefits Couche-Tard will enjoy as a result of the Proposed Transaction:

> We look forward to welcoming CST and CAPL to the Couche-Tard family. CST is an excellent company and is well positioned in the Southwestern United States with an important presence in Texas, Georgia, in the U.S. Southeast Region, New York and Eastern Canada. With this transaction we would strategically strengthen our positioning in both the "sun belt" and the east coast of North America. Our teams are looking forward to meeting CST customers and welcoming them into the CoucheTard family. We are excited to share best practices with CST as well as to combine the capabilities of CST's team with Couche-Tard's, to enhance value for our stockholders.

78. The press release also quotes Founder and Executive Chairman of the Board of Directors of Couche-Tard, Alain Bouchard, commenting on additional advantages to Couche-Tard:

> I have always thought that in our industry 'size matters', whether that be for purchasing, logistics, best practices or for becoming famous for our product categories. The addition of CST's exceptional people and its strategic assets takes us one step further towards all these goals. I look forward to welcoming the CST and CAPL teams onboard into our growing company.

79. Furthermore, an August 22, 2016 *Bloomberg* article entitled "Couche-Tard Agrees to Buy CST Brands for Almost $4 Billion" also describes the bonuses to Couche-Tard:

> The deal brings Couche-Tard -- French for "night owl" -- thousands of locations in the southeastern U.S., Texas and New York, as well as eastern Canada, part of a push to use mergers to expand. This is the convenience-store chain's fourth acquisition announcement this year and the largest in its 36-year history. It eclipses the 2012 purchase of Statoil Fuel & Retail ASA for about $2.8 billion, which established a foothold in Europe.
>
> "It's a great fit geographically," Brian Hannasch, chief executive officer of Laval, Quebec-based Couche-Tard, said on a conference call with reporters. "Our strength is in the U.S. Southeast, the West Coast and the Midwest. Texas is one of the fastest growth markets in the U.S."

80. In an August 23, 2016 *Seeking Alpha* article, equity analyst Quinn Foley further details the benefits Couche-Tard will enjoy as a result of the transaction, stating:

> [Couche-Tard] is Canada's largest gas/convenience store chain, operating more than 12,000 stores globally under the Couche-Tard, Circle K, Statoil, and Mac's brands, among others. The firm's strategy over the years has been to expand its footprint in areas with relatively low market penetration and above average growth potential. The CST acquisition makes sense in this regard. The company operates roughly 2,000 stores, many of which are located in Texas and Eastern Canada, which will allow [Couche-Tard] to strengthen its market position in Sun Belt states and the eastern region of North America where it lacks a strong presence. The CST acquisition will provide synergies through greater scale and the ability to trim redundant costs. CST was one of the last major public acquisition targets operating more than 1,000 stores in North America, and we think [Couche-Tard] will be able to negotiate more favorable merchandise and fuel input costs through higher purchase volumes. There are signs this has worked in recent acquisitions, as [Couche-Tard]'s gross margin has expanded from 12.9% in 2012 to 17.8% TTM, despite flat revenues. Will also see synergies through greater distribution efficiencies and lower overhead, the latter of which will be particularly key for [Couche-Tard] as the company has struggled to keep its overhead in check (SG&A rate has expanded almost 200 basis points since 2012).
>
> Earnings accretion can be good, but not if the company overpays for it and the firm's financial health becomes compromised as a result. We don't think this will be an issue with the CST acquisition. ANCUF expects to grow FCFs (before capex) at a 9% CAGR thanks to the acquisition, which should help the firm deleverage

> (management predicts net debt/EBITDA will fall from 3.5x in year 1 to 1.4x after year five). We have no reason to doubt management's forecasts, given the firm's history of consistently beating synergy and deleveraging targets. Despite completing a number of acquisitions in recent years, ANCUF's D/E ratio was just 0.56 after the most recent quarter, down from 0.93 in 2013.

**<u>The Board Locked Up the Proposed Transaction</u>**

81. The Merger Agreement contains deal protection devices which substantially increase the likelihood that the Proposed Transaction will be consummated, leaving CST's public shareholders with no meaningful change of control premium for their shares. When viewed collectively, these provisions, which are detailed below, further the interests of Couche-Tard, certain Individual Defendants and other CST insiders to the detriment of CST's public shareholders and cannot represent a justified, appropriate or proportionate response to any threat posed by a potential third party bidder. The Individual Defendants have agreed to the following unreasonable deal protection devices:

- A "no-solicitation" clause that prevents CST from soliciting, or its directors and officers from even participating in discussions which may lead to a superior proposal from any bidder (Merger Agreement, Section 5.5(a));
- An "information rights" provision that requires the Company to promptly advise Couche-Tard of any proposal or inquiries received from other parties, including the material terms and conditions of the proposal and the identity of the party making the proposal (Merger Agreement, Section 5.5(d));
- A "matching rights" provision that allows Couche-Tard four (4) business days to re-negotiate with the Board after it is provided with written notice of the Board's intention to make a change of recommendation, plus an additional two (2) business day

period following a material amendment to the terms and conditions of a superior offer or the submission of a new offer (Merger Agreement, Section 5.5(e)); and

- A termination fee of $133 million payable by the Company to Couche-Tard if CST decides to pursue a competing bid (Merger Agreement, Section 7.3).

82. The "no-solicitation" clause, the "information rights" provision, the "matching rights" provision and the termination fee unfairly restrain the Individual Defendants' ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to a third party's written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

83. The reason behind these deal protection devices is clear: the absence of a meaningful premium for shareholders creates the very real potential that a third party bidder will attempt to usurp Couche-Tard and submit a higher bid for CST. The possibility that a third-party bidder will emerge motivated Couche-Tard to "lock-up" the Proposed Transaction by co-opting the Board and forcing them to adopt unreasonable deal protection devices that would ensure that Couche-Tard could purchase the Company for less than would otherwise be possible.

84. The foregoing deal protection devices essentially foreclose the possibility that a third-party "white knight" could step forward to provide CST shareholders with a premium for their shares, instead of the opportunistic and inadequate compensation offered by the Proposed Transaction.

**<u>Insiders' Interests in the Proposed Transaction</u>**

85. Couche-Tard and CST insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public shareholders. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public shareholders of CST.

86. While CST's public shareholders are receiving inadequate consideration for their valuable CST holdings, the Company's directors and officers will achieve a substantial payday. Pursuant to the Merger Agreement, upon consummation of the merger, CST's directors and officers will receive cash payments from the immediate vesting of all outstanding stock options, restricted stock awards, restricted stock units and market share units, whether or not vested -- an opportunity that would not otherwise be available. The following table summarizes the aggregate amount payable to the Company's named executive officers in connection with the Proposed Transaction for their unvested stock options, restricted stock awards, restricted stock units and market share units:

| **Name** | **Options ($)** | **RSUs ($)** | **MSUs ($)** |
|---|---|---|---|
| ***Named Executive Officers*** | | | |
| Kimberly S. Lubel | 2,243,91 3 | 2,780,09 0 | 1,648,42 1 |
| Clayton E. Killinger | – | – | 811,049 |
| Anthony P. Bartys | – | – | 919,170 |
| Stephan F. Motz | – | – | – |
| Charles H. (Hal) Adams | – | – | 561,565 |

87. If they are terminated in connection with the Proposed Transaction, CST's named executive officers are set to receive substantial cash payments in the form of merger-related compensation, as detailed in the chart below:

| Name | CST Severance Payment ($) | Prorated Target Annual Short-Term Incentive ($) | CAPL EICP Severance Payment ($) |
|---|---|---|---|
| ***Named Executive Officers*** | | | |
| Kimberly S. Lubel | 5,536,250 | 888,375 | – |
| Clayton E. Killinger | 2,297,750 | 369,281 | 2,297,750 |
| Anthony P. Bartys | 1,539,450 | 227,419 | – |
| Stephan F. Motz | 771,313 | – | – |
| Charles H. (Hal) Adams | 1,650,000 | 243,750 | – |

88. Moreover, CST's directors and officers will receive substantial cash consideration for their significant holdings of CST stock. By pursuing and approving the Proposed Transaction, the Company's directors and officers will gain liquidity for their otherwise illiquid Company holdings. A summary of the payments the Company's officers and directors stand to receive is disclosed in the Proxy and set forth in the following table. Lubel alone is set to receive over $13.1 million, as detailed below:

| Name | Cash ($) (1) | Equity ($) (2) | Perquisites/ Benefits ($) (3) | Total ($) |
|---|---|---|---|---|
| ***Named Executive Officers*** | | | | |
| Kimberly S. Lubel | 6,424,625 | 6,672,423 | 71,468 | 13,168,516 |
| Clayton E. Killinger | 4,964,781 | 811,049 | 87,398 | 5,863,228 |
| Anthony P. Bartys | 1,766,869 | 419,170 | 38,906 | 2,224,945 |
| Stephan F. Motz | 771,313 | – | 2,075 | 773,388 |
| Charles H. (Hal) Adams | 1,893,750 | 561,564 | 74,050 | 2,529,364 |

89. Therefore, while CST's public shareholders will lose control of the Company for an unfair price, certain Company insiders will substantially benefit if the Proposed Transaction is consummated.

**<u>The Proxy Contains Material Misstatements and/or Omissions</u>**

90. Compounding the unfair sale process and the inadequacy of the Merger Consideration, Defendants also filed the materially incomplete and misleading Proxy with the SEC and disseminated it to CST's shareholders. The Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed decision whether to vote in favor of the Proposed Transaction.

91. Specifically, as set forth below, the Proxy fails to provide Company shareholders with material information or provides them with materially misleading information concerning: (a) CST management's projections, utilized by BofA Merrill Lynch in its financial analyses; (b) the valuation analyses prepared by BofA Merrill Lynch in connection with the rendering of its fairness opinion; and (c) material information concerning the sale process leading up to the

Proposed Transaction. Accordingly, CST shareholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

**Material Omissions Regarding CST's Financial Projections**

92. The Proxy fails to disclose material information relating to the Company's intrinsic value and prospects going forward.

93. With respect to the "Summary of the CST Projections" on page 30 of the Proxy, the Proxy fails to disclose the financial projections provided by CST management and relied upon by BofA Merrill Lynch for purposes of its analysis, for years 2016-2020, for the following items: (a) unlevered free cash flows ("UFCF"); (b) reconciliation of GAAP net income to non-GAAP unlevered free cash flow ("UFCF") and non-GAAP Adjusted EBITDA; (c) stock-based compensation; and (d) estimated limited partner distributions to CST.

94. The omission of this information renders the following statements in the Proxy false and/or materially misleading in contravention of the Exchange Act:

(a) From page 35 of the Proxy:

> **Discounted Cash Flow and Discounted Distributions Analysis**.
>
> BofA Merrill Lynch performed a discounted cash flow analysis of CST, calculating the estimated present value of the standalone unlevered, after-tax free cash flows of CST's retail business, the estimated present value of the distributions with respect to CST's limited partnership interests in CAPL and the estimated present value of the distributions with respect to CST's ownership interest in the general partner of CAPL, in each case forecasted during the fiscal year 2016 after June 30, 2016 through the full fiscal year ending December 31, 2020 based on CST management forecasts. . . . BofA Merrill Lynch then performed a discounted distribution analysis to calculate the estimated present value of the estimated limited partner distributions to CST from its ownership interest in limited partner units of CAPL during fiscal year 2016 after June 30, 2016 through the full fiscal year ending December 31, 2020, based on CST management forecasts. BofA Merrill Lynch calculated terminal values of such limited partner distributions by applying a

range of terminal yields of 9.0% to 12.0% to fiscal year 2020 estimated limited partner distributions to CST.

(b) From pages 29-30 of the Proxy:

**Certain CST Unaudited Prospective Financial Information**

In connection with the merger, CST's management prepared financial projections of Adjusted EBITDA, reconciled from Net Income, and Capital Expenditures for fiscal years 2016 through 2020 (which we refer to as the "CST Projections"). The CST Projections were prepared for internal use and provided to CST's board of directors for the purposes of considering, analyzing and evaluating CST's strategic and financial alternatives, including the merger. The CST Projections were provided to BofA Merrill Lynch in connection with rendering its fairness opinion to the CST board of directors and in performing the related analyses. CST does not as a matter of course make public projections as to future performance due to, among other reasons, the inherent difficulty of accurately predicting financial performance for future periods and the uncertainty of underlying assumptions and estimates. However, CST is including in this document a summary of certain unaudited financial projections for CST on a stand-alone basis, without giving effect to the merger, to give CST stockholders access to certain nonpublic information provided to CST's board of directors and CST's financial advisor for purposes of considering and evaluating the merger. The inclusion of the CST Projections should not be regarded as an indication that CST, its board of directors or any other recipient of this information considered, or now considers, it to be an assurance of the achievement of future results or an accurate prediction of future results, and it should not be relied on as such. The CST Projections and the underlying assumptions upon which the CST Projections were based are subjective in many respects, and subject to multiple interpretations and frequent revisions based on actual experience and business developments.

The CST Projections reflect numerous assumptions with respect to company performance, industry performance, general business, economic, regulatory, market and financial conditions and other matters, many of which are difficult to predict, subject to significant economic and competitive uncertainties and beyond CST's control. Multiple factors, including those described in the section entitled

"Cautionary Statement Concerning Forward-Looking Statements," could cause the CST Projections or the underlying assumptions to be inaccurate. As a result, there can be no assurance that the CST

Projections will be realized or that actual results will not be significantly higher or lower than projected. The CST Projections cover multiple years, and projections by their nature become less reliable with each successive year. In addition, the CST Projections have not been updated or revised to reflect information or results after the date the CST Projections were prepared or as of date of this document, and except as required by applicable securities laws, CST does not intend to update or otherwise revise the CST Projections or the specific portions presented to reflect circumstances existing after the date when made or to reflect the occurrence of future events, even in the event that any or all of the assumptions are shown to be in error. Economic and business environments can and do change quickly, which adds a significant level of uncertainty as to whether the results portrayed in the CST Projections will be achieved. As a result, the inclusion of the CST Projections in this document does not constitute an admission or representation by CST or any other person that the information is material. The CST Projections do not take into account the possible effects on CST of the merger and do not attempt to predict or suggest future results of the combined company. The CST Projections do not give effect to the merger, including the impact of negotiating or executing the merger agreement, the expenses that may be incurred in connection with consummating the merger, the potential synergies that may be achieved by the combined company as a result of the merger, the effect on CST of any business or strategic decision or action that has been or will be taken as a result of the merger agreement having been executed, or the effect of any business or strategic decisions or actions that would likely have been taken if the merger agreement had not been executed, but that were instead altered, accelerated, postponed or not taken in anticipation of the merger. Further, the CST Projections do not take into account the effect on CST of any possible failure of the merger to occur. The summary of the CST Projections is not provided to influence CST stockholders' decisions regarding whether to vote for the merger proposal or any other proposal.

The CST Projections were not prepared with a view toward public disclosure or toward compliance with United States generally accepted accounting principles (which we refer to as "GAAP"), published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. Neither KPM LLP, CST's independent registered public accounting firm, nor any other accounting firm, has examined, compiled or performed any procedures with respect to the CST Projections, and accordingly, KPMG LLP does not express an opinion or any other form of

assurance with respect thereto. The KPMG LLP report incorporated by reference in this document relates to CST's historical financial information. It does not extend to the prospective financial information contained herein and should not be read to do so.

The following is a summary of the CST Projections:

**Summary of the CST Projections**

*(U.S. dollars in millions)*

| | Projected Fiscal Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | |
| Net Income | $ | 342 | $ | 161 | $ | 195 | $ | 246 | $ | 291 |
| Interest Expense | | 42 | | 35 | | 36 | | 39 | | 40 |
| Income Tax Expense | | 188 | | 90 | | 111 | | 141 | | 166 |
| Depreciation, Amortization and Accretion Expense | | 175 | | 175 | | 190 | | 206 | | 224 |
| EBITDA | $ | 747 | $ | 461 | $ | 532 | $ | 632 | $ | 721 |
| Gains on the Sale of Assets | | (350) | | (35) | | (22) | | (26) | | (28) |
| Equity in Earnings from CAPL | | 2 | | (3) | | (5) | | (7) | | (11) |
| IDRs from CAPL | | (3) | | (5) | | (6) | | (8) | | (12) |
| Adjusted EBITDA | $ | 396 | $ | 418 | $ | 499 | $ | 591 | $ | 670 |
| Capital Expenditures | $ | (462) | $ | (496) | $ | (557) | $ | (588) | $ | (628) |

(1)Earnings before interest, income taxes and depreciation and amortization (which we refer to as "EBITDA") is a non-GAAP measure consisting of net income plus interest expense, provision for income taxes and depreciation and amortization. Projected Adjusted EBITDA for fiscal years 2016 through 2020 adjusts projected EBITDA to exclude equity in earnings from CAPL, incentive distribution rights (which we refer to as "IDRs") income from CAPL and gains on the sale of assets.

For the foregoing reasons, and considering that the special meeting will be held several months after the CST Projections were prepared, as well as the uncertainties inherent in any forecasting information, readers of this document are cautioned not to place unwarranted reliance on the CST Projections set forth above. No one has made or makes any representation to any stockholder regarding the information included in the CST Projections. CST urges all CST stockholders to review its most recent SEC filings for a description of its reported financial results. See the section entitled "*Where You Can Find Additional Information*."

**<u>Material Omissions Regarding BofA Merrill Lynch's Financial Analyses</u>**

95. The Proxy describes BofA Merrill Lynch's fairness opinion and the various valuation analyses it performed in support of its opinion. However, the description of BofA Merrill Lynch's fairness opinion and analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, CST's public shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on BofA Merrill Lynch's fairness opinion in determining whether to vote in favor of the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to CST's shareholders.

96. The Proxy fails to disclose various material elements of the financial analysis performed by BofA Merrill Lynch. For example, with respect to BofA Merrill Lynch's Company Financial Analyses, the Proxy fails to disclose: (a) the individual 2016 estimated EBITDA multiples for each of the selected public companies analyzed by BofA Merrill Lynch, as well as any benchmarking analyses BofA Merrill Lynch performed for CST in relation to the selected public companies; and (b) the individual general partner distribution yields for each of the selected publicly traded general partnerships analyzed by BofA Merrill Lynch, as well as any benchmarking analyses BofA Merrill Lynch performed for CAPL in relation to the selected publicly traded general partnerships. Without this omitted information, CST shareholders have no way of determining whether the multiples and distribution yield ranges applied by BofA Merrill Lynch were appropriate when compared to the multiples and distribution yields observed for the selected companies and general partnerships, and thus, have no way of determining whether the implied per share reference ranges accurately reflect the value of their shares.

97. In addition, with respect to BofA Merrill Lynch's Selected Precedent Transactions Analysis, the Proxy fails to disclose: (a) the observed LTM EBITDA multiples for each selected

transaction involving companies in the retail convenience store industry analyzed by BofA Merrill Lynch; and (b) the observed general partner distributable cash flow multiple for each of the general partnership transactions analyzed by BofA Merrill Lynch. Without this omitted information, CST shareholders have no way of determining whether the multiples applied by BofA Merrill Lynch were appropriate when compared to the multiples observed for the selected transactions, and thus, have no way of determining whether the implied per share reference ranges accurately reflect the value of their shares.

98. With respect to BofA Merrill Lynch's Discounted Cash Flow and Discounted Distributions Analysis, the Proxy fails to disclose: (a) the assumptions underlying BofA Merrill Lynch's estimate of CST's WACC, and quantification for each assumption; (b) the definition/formula for UFCF used by BofA Merrill Lynch, and how stock-based compensation expenses were treated in the analysis; (c) the basis for the 8.0x-10.0x range of selected retail terminal value EBITDA multiples selected; (d) the implied perpetuity growth rates corresponding to the assumed terminal pricing multiples; (e) the basis for the range of terminal yields of 9.0% - 12.0% to fiscal year 2020 estimated limited partner distributions to CST selected by BofA Merrill Lynch; (f) the assumptions underlying BofA Merrill Lynch's estimate of CAPL's cost of equity, and quantification for each assumption; and (g) the basis for the range of terminal yields of 7.0% - 9.0% to fiscal year 2020 estimated incentive distribution rights distributions to CST selected by BofA Merrill Lynch.

## COUNT I

### Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against All Individual Defendants

99. Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

100. Defendants disseminated the false and misleading Registration Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Aegerion is liable as the issuer of these statements.

101. The Registration Statement was prepared, reviewed, and/or disseminated by Defendants. By virtue of their positions within the Company, Defendants were aware of this information and their duty to disclose this information in the Registration Statement.

102. Defendants were at least negligent in filing the Registration Statement with these materially false and misleading statements.

103. The omissions and false and misleading statements in the Registration Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Registration Statement and in other information reasonably available to stockholders.

104. The Registration Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

105. By reason of the foregoing, Defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

106. Because of the false and misleading statements in the Registration Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act Against the Individual Defendants

107. Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

108. The Individual Defendants acted as controlling persons of CST within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of CST and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

109. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

110. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Registration Statement.

111. By virtue of the foregoing, the Individual Defendants violated Section 20(a) of the 1934 Act.

112. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act

and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Directing the Individual Defendants to disseminate a Registration Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D. Declaring that Defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E. Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: October 12, 2016

**GAINEY McKENNA & EGLESTON**

By: *<u>/s/ Thomas J. McKenna</u>*
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

**THE JOHNSON LAW FIRM**
James L. Johnson
6500 Greenville Avenue, Suite 345
Dallas, TX 75206
Te1: (214) 363-1629
Fax: (214) 363-9173
E-mail: james@jamesljohnsondallasattorney.com

***Attorneys for Plaintiff***